**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| 7-ELEVEN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VIOLET SPEAR and VIANNA, INC., | ) | Case No. 10-cv-6697 |
| | ) | |
| Defendants/Counter-Plaintiffs, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| v. | ) | |
| | ) | |
| 7-ELEVEN, INC., | ) | |
| | ) | |
| Counter-Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff 7-Eleven, Inc. has filed suit against Defendants Violet Spear and Vianna, Inc. (collectively "Defendants") seeking legal and equitable relief from Defendants concerning the termination of a franchise agreement between the parties. In turn, Defendants have filed counterclaims alleging that 7-Eleven's conduct violated Section 6 of the Illinois Franchise Disclosure Act, 815 ILCS 705/6, and Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, and also constituted common law fraud. Currently before the Court is Plaintiff's motion for a preliminary injunction [8] seeking to enjoin Defendants from allegedly (i) breaching their post-termination obligations under Vianna's franchise agreement with 7-Eleven, (ii) infringing 7-Eleven's federally registered trademarks and service marks in violation of the Lanham Act, 15 U.S.C. § 1114(1), and (iii) unfairly competing with 7-Eleven in violation of the Lanham Act, 15 U.S.C. § 1125(a), and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2.

1

**I.     Background**

Plaintiff 7-Eleven is the owner of certain federally registered trademarks and service marks, including 7-Eleven®, which are used in connection with the operation of authorized 7-Eleven stores. 7-Eleven grants franchises to qualified persons to own and operate 7-Eleven Stores. Defendant Vianna is a former 7-Eleven franchisee that operated a 7-Eleven store in Evanston, Illinois. Defendant Violet Spear is the owner of Vianna.

Pursuant to written franchise agreements, 7-Eleven licenses franchisees to operate under the 7-Eleven marks, and it leases the store premises to them, together with the fixtures, equipment, and signs needed to operate the store. 7-Eleven also provides financing to its franchisees, including financing for the store's inventory. According to 7-Eleven, and not disputed by Defendants, store inventory and other assets are subject to a perfected security interest in 7-Eleven's favor, which secures all the indebtedness of the franchisees to 7-Eleven. In exchange for the license and lease, and for various other services (*e.g.*, advertising, merchandising assistance, bookkeeping, certain maintenance, payment of utility expenses, indemnification for specified losses), the franchise agreement entitles 7-Eleven to receive a specified percentage of the gross profits of the ongoing operation of the store. 7-Eleven asserts that this percentage of gross profits is its primary benefit under the franchise agreement.

On March 14, 2008, 7-Eleven and Defendant Spear entered into a written franchise agreement, pursuant to which 7-Eleven (i) granted Vianna a franchise, for an initial 15 year term, to operate a 7-Eleven store at 817 Davis Street in Evanston, Illinois (the "Store") and (ii) licensed Spear to use the 7-Eleven Marks in operating the franchise. Spear assigned the franchise agreement to Vianna, a corporation of which she was sole shareholder, but remained

liable for all of Vianna's obligations under the franchise agreement pursuant to a written guaranty.

In addition to the obligations outlined above, Defendants agreed to operate their 7-Eleven store in compliance with all laws, and in conformity with 7-Eleven's standards and specifications. Vianna agreed to maintain a minimum net worth of $15,000 in the Store at all times and further agreed that failure to maintain the required net worth was a material breach of the Franchise Agreement. Vianna also agreed that in the event that 7-Eleven terminated the Franchise Agreement for cause, Vianna would, among other things, (i) immediately surrender the Store premises and all 7-Eleven equipment, (ii) transfer final inventory of the Store, (iii) deliver to 7-Eleven its operations guides and all trade secrets and confidential information, and (iv) comply with the franchise agreement's post-termination obligations. Vianna also agreed that, upon termination, it would immediately cease using the 7-Eleven Marks.

Although Vianna agreed in the Franchise Agreement to maintain a minimum net worth of $15,000 at all times, at the end of March, 2010, Vianna's net worth in the Store was about $6,500, a shortfall of nearly $8,500. According to Defendant Spear, when she and her daughter questioned 7-Eleven's field consultant regarding why the shortfall had occurred, he responded that it could be due to several factors, but that this Store always ran $20,000.00 short each month. See Spear Affidavit at ¶ 13.

By letter dated April 28, 2010, 7-Eleven notified Vianna that it had three business days to increase the net worth to the required level, as well as to cure another monetary default under the Franchise Agreement. Vianna cured the material breaches which were the subject of the April 28, 2010 notice of material breach, but soon thereafter again failed to meet the minimum net worth requirement under the Franchise Agreement. Vianna's May 2010 financial statements

indicated that the Store's net worth was only $6,775.34, instead of the required $15,000. In June, the shortfall from the minimum net worth requirement was $27,000, and in July, it was more than $40,000. As a result of Vianna's failure to maintain the required minimum net worth, 7-Eleven sent a notice of material breach to Vianna dated August 27, 2010, advising Vianna that it had three business days to increase its net worth to the required level or 7-Eleven would terminate the Franchise Agreement. Defendants did not cure the minimum net worth material breach. At the end of August, the Store had a negative net worth of $43,962.09, which was approximately $59,000 under the minimum net worth required under the Franchise Agreement. 7-Eleven extended the termination date in order to allow Vianna more time to cure the net worth deficiency and preserve its franchise rights, but as of the end of September 2010, Vianna was still nearly $40,000 under the required minimum net worth. 7-Eleven terminated the Franchise Agreement effective September 27, 2010.

According to Plaintiff, and not contested by Defendants, Defendants have refused to surrender possession of the Store, equipment, and inventory and continue to use the 7-Eleven marks in connection with the operation of the Store.

**II.   Analysis**

Like all forms of injunctive relief, a preliminary injunction is "an extraordinary remedy that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). A party seeking a temporary restraining order must demonstrate as a threshold matter that (1) its case has some likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if preliminary relief is denied. See *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992); see also *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the*

*United States of America, Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008). If the moving party meets this burden, then the court must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). Finally, the court considers the public interest served by granting or denying the relief, including the effects of the relief on non-parties. *Id.*; see also *Credit Suisse First Boston, LLC v. Vender*, 2004 WL 2806191, at *1 (N.D. Ill. Dec. 3, 2004). The court then weighs all of these factors, "sitting as would a chancellor in equity" (*Abbott*, 971 F.2d at 12) and applying a "sliding scale" approach, under which "the more likely plaintiff will succeed on the merits, the less the balance of irreparable harms need favor plaintiff's position." *Ty, Inc. v. The Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001).

### A. Request for Expedited Discovery

Defendants asked the Court to grant them leave to conduct certain limited written discovery prior to a ruling on the pending preliminary injunction motion, and for leave to file a sur-reply after that discovery is tendered. Although the Court has already denied Defendants' motion without prejudice, the Court will again briefly address Defendants' request and elaborate on the reasons for denying the motion.

In support of their motion for expedited discovery, Defendants contended that while they were prospective franchisees, 7-Eleven withheld from them information that the subject store, while being operated by 7-Eleven itself, failed to meet its budgetary and financial projections. Defendants maintain that 7-Eleven's conduct violated Section 6 of the Illinois Franchise Disclosure Act, 815 ILCS 705/6 and Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 and also constituted common law fraud. Defendants

have brought counterclaims that reflect these allegations.[1] Defendants' allegations hinge on statements allegedly made to them by 7-Eleven's Field Consultant, Greg Kuczak, after Defendants had assumed operation of the Store. Defendants informed the Court that, prior to filing their answer and counterclaims, they had requested that 7-Eleven provide copies of documents reflecting the store's historical, pre-franchise performance, but 7-Eleven refused their request. Defendants contend that absent the data concerning the financial and operational performance of the Davis Street store during the period in which 7-Eleven operated that store, Defendants and the Court are deprived of information essential to the determination of the preliminary injunction motion. For instance, Defendants contend that if Mr. Kuczaks' statement regarding the Store was accurate, that could explain why 7-Eleven's sales representative, Susan Corral, allegedly refused to provide them any historical performance data concerning the Store's operation when Spear requested such information while she was a prospective franchisee.

Plaintiff contends that the requested information, while relevant to Defendants' fraud-based common law and statutory counterclaims, is not essential to the determination of the current motion. The Court agrees. Even assuming that Defendants' allegations are correct, Defendants' actions constituted a material breach of the franchise agreement sufficient to justify termination, and thus, for purposes of the motion for preliminary injunction, it does not matter whether Defendants may have fraud-type claims that they can pursue separately. See *Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 279 (7th Cir. 1992) (citing *Patton v. Mid-Continent Systems, Inc.,* 841 F.2d 742, 750 (7th Cir. 1988)) ("The fact that the Cookie Company may * * * have treated other franchisees more leniently is no more a defense to a breach of contract than laxity in enforcing the speed limit is a defense to a speeding ticket * * * * Liability for breach of contract is strict."). Indeed, all of the

---

[1] The parties currently are briefing Plaintiff's motion to dismiss the counterclaims.

court of appeals decisions that the parties have cited and that the Court's research has located hold that "a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1309 (11th Cir. 1998) (quoting *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992)); see also *7-Eleven, Inc. v. McEvoy*, 300 F. Supp. 2d 352, 358-59 (D. Md. 2004). Defendants' claims of fraud and deception leading up to the execution of the franchise agreement—and, in particular, the alleged concealment of the Store's poor sales while 7-Eleven operated the Store—do not bear on 7-Eleven's motion for a preliminary injunction to enforce a contract termination based on Defendants' non-performance. See also *Dunkin' Donuts, Inc. v. Liu,* 2000 U.S. Dist. LEXIS 18388, at *13 (E. D. Pa. Dec. 21, 2000) (defendants "cannot rely on [franchisor's] wrongdoing to avoid the consequences of their non-performance"); *Dunkin' Donuts Inc. v. Liu,* 79 Fed. Appx. 543, 547 (3d Cir. 2003) (quoting *S & R Corp.,* 968 F.2d at 375) (stating that a franchisee's counterclaim for the breach of the covenant of good faith and fair dealing was irrelevant to whether the franchisor properly terminated the franchise agreement). For these reasons, the Court reaffirms the denial of Defendants' request for expedited discovery.[2]

## B.   Likelihood of Success on the Merits

A party seeking a TRO or a preliminary injunction must demonstrate "that it has a 'better than negligible' chance of success on the merits of at least one of its claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, 549 F.3d 1079, 1096 (7th Cir. 2008). This is an "admittedly low requirement." *Id.*

---

[2]  In its reply brief, Plaintiff spends several pages setting forth why, even if Defendants' fraud claims were in some way relevant to the enforcement of 7-Eleven's termination of the franchise, 7-Eleven still would be entitled to the injunctive relief that it seeks. See Pls. Reply at 3-10. In view of the foregoing discussion, the Court need not consider those additional arguments at this time.

7

*1.     Contract-based claims*

Defendants' right to possess the inventory, equipment, and premises of the Store was created by the franchise agreement and the accompanying security agreements. As evidenced by the signed agreements, the parties contemplated ejectment and surrender of all equipment and inventory to 7-Eleven following termination. Under the express terms of the franchise agreement, in the event that Defendants failed to maintain at least $15,000 in equity in the Store, and failed to replace the deficiency in capital within three business days of notice of material breach, 7-Eleven was entitled to terminate the franchise agreement, including Defendants' occupancy of the premises and use of 7- Eleven's marks and brand. As set forth by Plaintiff (and not contested by Defendants), Vianna failed to meet the minimum net worth requirement during the months of March, May, June, July and August, 2010. During that period of time, 7-Eleven sent two formal notices of material breach with respect to the minimum net worth requirement. The first of those breaches was corrected, but the second was not. At the time that the second notice of material breach was sent in late August 2010, Defendants had a shortfall in store equity of nearly $60,000. Although they made some capital contributions in September, they remained nearly $40,000 short of the minimum net worth that was required under the agreement. At that time, 7-Eleven terminated the franchise agreement for cause.

Despite the termination of the franchise agreement, Defendants refuse to perform their post-termination obligations under the agreement, including their obligations to immediately deliver and surrender full and complete possession of the Store, the equipment, and the inventory to 7-Eleven. While Defendants' response brief details the various ways that Defendants believe 7-Eleven fraudulently induced them to enter into the franchise agreement and how the entry of the preliminary injunction would deprive them of the resources to pursue those counterclaims,

they do not contend that their failure to maintain the contractually required net worth in the Store was not a breach of the franchise agreement. On that basis, the Court concludes that 7-Eleven has a very strong likelihood of success of demonstrating both Defendants' initial breach of the agreement as well as Defendants' failure to comply with their post-termination covenants. See *All EMS, Inc. v. 7-Eleven, Inc.*, 2005 WL 2293675, at *4 (N.D. Ill. Jan. 4, 2005) (holding that when a franchisee's net worth falls below the required mark, that "fact alone is enough to prove" that the franchisee breached the agreement and have "surrendered their rights to the franchise"); see also *PP&K, Inc. v. McCumber*, 46 F.3d 1134, at *2-3 (7th Cir. Feb. 6, 1995) (unpublished) (because the sublease gave the franchisor a right to possession upon termination, the franchisor had "great likelihood of success" on its claim for a preliminary injunction requiring a franchisee to vacate the franchised premises); *Cal City Optical Inc. v. Pearle Vision, Inc.,* 1994 WL 114859, at *2 (N.D. Ill. March 28, 1994) (holding that the franchisor had a likelihood of success on the merits because the franchisee defaulted on its contractual obligations).

### 2. *Lanham Act and Deceptive Trade Practices Act claims*

The Lanham Act creates a claim for trademark infringement when a trademark holder can demonstrate that the use of its trademark by another is likely to confuse consumers as to the source of the product. See *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2004). "A licensee who once had authorization becomes associated in the public mind with the licensor or franchisor." *Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1504 n. 4 (S.D. Fla. 1995) (quoting 3 J. McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 25.07[1], at 25-48.2 (3d ed. 1994)). Therefore, when a franchisee loses authorization but continues use of the francisor's mark, the potential for consumer confusion is great because the public is fraudulently "led to think that the ex-licensee is still connected with the licensor." 3 J. McCarthy,

TRADEMARKS AND UNFAIR COMPETITION § 25.07[1]; see also *Ramada Franchise Systems, Inc. v. Royal Vale Hospitality of Cincinnati, Inc.*, 2005 WL 435263, at *15 (N.D. Ill. Feb. 16, 2005). For this reason, it is a "well-settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement." *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992); see also *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989). Here, there is a substantial likelihood that Defendants' continued, unauthorized use of the 7-Eleven Marks will cause consumer confusion and, accordingly, constitute trademark infringement in violation of §§ 32(1) and 43(a) of the Lanham Act. See *Dunkin' Donuts Franchised Restaurants v. Elkhatib*, 2009 WL 2192753, *5 (N.D. Ill. July 17, 2009) ("where a holdover franchisee * * * utilizes the franchisor's marks, the 'likelihood of confusion is inevitable'"); *Bunn-O-Matic Corp. v. Bunn Coffee Serv.*, 88 F. Supp. 2d 914, 922 (C.D. Ill. 2000) ("The likelihood of confusion exists as a matter of law if a licensee continues to use marks owned by the licensor after termination of the license.").[3]

### C. Irreparable Harm/Absence of Adequate Remedy at Law

"[I]t is well-established in the Seventh Circuit that irreparable harm and inadequate remedy at law are presumed in trademark and trade dress infringement cases." *Dunkin' Donuts*

---

[3] Because it constitutes trademark infringement, Plaintiff also has a high likelihood of demonstrating that Defendants' infringement of the 7-Eleven marks constitutes unfair competition in violation of Section 43(a) of the Lanham Act and under the Illinois Uniform Deceptive Trade Practices Act. See *Bunn Coffee*, 88 F. Supp. 2d at 924 (proof of trademark infringement constitutes unfair competition under both Illinois and New York law); *Pirelli Armstrong Tire Corp. v. Titan Tire Corp.*, 4 F. Supp. 2d 794, 799 (C.D. Ill. 1998) (same). "As a general rule * * * the same facts which would support an action for trademark infringement [under Section 32(1)] would also support an action for unfair competition [under Section 43(a)]." *Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir.), *cert. denied*, 423 U.S. 868 (1975); accord *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 n.16 (7th Cir. 1976). Similarly, the same set of facts will support a claim for both trademark infringement and unfair competition under the Illinois Deceptive Trade Practices Act. See *McDonald's Corp. v. Gunvill*, 441 F. Supp. 71, 74-75 (N.D. Ill. 1977).

*Franchised Restaurants LLC v. Elkhatib*, 2009 WL 2192753, at *4 (N.D. Ill. July 17, 2009); see also *Re/Max N. Cent., Inc. v. Cook,* 272 F.3d 424, 432 (7th Cir. 2001) ("Irreparable harm is generally presumed in cases of trademark infringement and dilution."); *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982) ("This and many other Courts have often recognized that the damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law."). This willingness to find irreparable harm in trademark cases stems from an understanding that the "most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." *Int'l Kennel Club of Chi., Inc., Mighty Star, Inc*., 846 F.2d 1079, 1092 (7th Cir. 1988).

Defendants do not contest the proposition that unauthorized use of another's trademark establishes irreparable harm, choosing instead to argue that the balance of the harms and public policy militate in favor of denying the injunction.[4] Because Defendants continue to use 7-Eleven's marks and logos, the potential for harm as a result of improper use of the mark is immediate. See *Re/Max*, 272 F.3d at 432 ("While Cook continues to use Re/Max's marks and logos, it has no quality over the services she provides or potential harm to its goodwill"). Having terminated the franchise agreement, 7-Eleven has no control over what products and services

---

[4] While Violet Spear concludes in her affidavit that "7-Eleven's trademarks have not been, and will not in the future, be harmed by Vianna's continued operation of the 7-Eleven store on Davis Street in Evanston, Illinois, pending resolution of the claims made by each party against one another," the Court must disregard such legal conclusions. See *Heartland Direct, Inc. v. Unum Life Ins. Co. of Am*., 2002 WL 206002, at *1 (N.D. Ill. Feb. 8, 2002) (holding that legal conclusions in affidavits should be disregarded). Ms. Spear's statement also is contradicted by the well-settled case law cited above holding that a franchisor *is* irreparably harmed when a former franchisee continues to use its trademarks and refuses to surrender possession of the franchisor's property.

Defendants choose to offer under the 7-Eleven brand. Additionally, if deprived of its contractual right to possession of the Store during the pendency of the litigation, 7-Eleven could lose the customers and goodwill associated with that location. See *PP&K, Inc.,* 46 F.3d 1134, at *3 (finding that franchisor would lose the goodwill and reputation associated with the franchised location if the franchisee was not ordered to vacate the premises). Therefore, the Court determines that Plaintiff has satisfied the irreparable harm requirement.

### D. Balance of Harms and Public Interest

Because Plaintiff has made a significant showing as to the first three requirements for the issuance of an injunction, the Court must consider the extent of harm that Defendants would suffer if preliminary relief is granted, and balance that harm against the harm that Plaintiff would suffer if relief is denied. The Court also must consider the effect of an injunction on the public, and weigh all of the factors under this circuit's sliding scale approach.

Defendants argue that if the injunction is granted they will suffer irreparable harm because they will be "denied the ability to continue operating the store and earn revenue during the pendency of this lawsuit," rendering them "unable to defend themselves or vindicate their rights." Def. Resp. Brief at 2-4. However, Defendants' speculative inability to finance this litigation does not weigh heavily in the preliminary injunction calculus. See *Roland Mach. Co.,* 749 F.2d 380, 386 (holding that a party's ability to finance its lawsuit "will rarely be a decisive consideration."). As Judge Kocoras observed in granting a preliminary injunction preventing a terminated licensee from continuing to do business under the licensor's brand, the lost profits that the enjoined party will suffer "merit[] little equitable consideration," since they are not entitled to profits garnered from the misrepresentation of their status as a licensee. *Florists' Transworld Delivery, Inc. v. Originals Florist & Gifts, Inc.,* 2000 WL 1923321, at *4 (N.D. Ill.

Nov. 9, 2000). Additionally, while Defendants maintain (perhaps correctly) that the entry of an injunction will cause them to lose income, irreparable injury does not typically include "the loss of income, inability to find other employment or financial distress." *Simonsen v. Bd. of Educ. of the City of Chicago*, 2001 WL 1230661, at *3 (N.D. Ill. Oct. 15, 2001).

On the other hand, the case law recognizes that the customer confusion, dilution of trademark, and loss of goodwill that 7-Eleven is presumed to suffer due to Defendants' post-termination use of 7-Eleven's Marks and property threaten irreparable harm to 7-Eleven. And injury to 7-Eleven's goodwill, business reputation, name, and marks ultimately also harms 7-Eleven's other franchisees. Taking all of the circumstances into account in the weighing of the harms asserted by both parties, the Court concludes that the balance is at best a wash, and, considering the cases which hold that Defendants' loss of income should not weigh heavily in the calculus, the balance may even tip in favor of Plaintiff.[5]

Finally, Plaintiff argues that the public interest favors the issuance of an injunction, which will prevent consumer confusion. See *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 469 (7th Cir. 2000) ("the public interest is served by the injunction because enforcement of the trademark laws prevents consumer confusion"). Defendants maintain that this case "presents similar[ ] significant public interest concerns" to those that existed in *Milsen Co. v. Southland Corp.*, 454 F.2d 363 (7th Cir. 1971), where the Seventh Circuit preliminarily enjoined a franchisor from terminating a franchise prior to trial. In *Milsen*, after the franchisees filed their complaint alleging that the defendants had violated both the Sherman Act and the Clayton Acts, the defendants sent default notices to the plaintiffs informing them that the agreements would be

---

[5] Although the Court must consider the balance of harms in determining whether to grant 7-Eleven's request for a preliminary injunction, the greater the chances that 7-Eleven will succeed on the merits, the less the need for the balance of harms to weigh in 7-Eleven's favor. See *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 387 (7th Cir. 1984).

terminated in 15 days if the past due fees were not paid. 454 F.2d at 364. Plaintiffs subsequently filed an emergency motion for preliminary injunction seeking to enjoin the terminations. *Id*. at 365. Relying on the public interest in encouraging antitrust prosecutions by private parties (*id*. at 366-67) and "the wisdom of courts which have refused to permit a party to benefit from contractual rights when the contract is an instrument of restraining of trade" (*id*. at 368-69), the court enjoined the terminations.

Contrast the scenario found in *Milsen* with the one presented in *Dunkin' Donuts, Inc. v. Donuts, Inc*., 2000 WL 1808517, at *3 (N.D. Ill. Dec. 6, 2000), in which the franchisee refused to cease operations after termination. The franchisor filed a complaint asserting claims for breach of contract, trademark infringement, unfair competition, and trademark dilution. The franchisee filed a counterclaim, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, breach of the IFDA, and intentional and negligent misrepresentation and omissions. In opposition to the franchisor's request for injunctive relief, the franchisee cited *Milsen* in an attempt to avoid the entry of an injunction. The Court held that *Milsen* was distinguishable because, unlike in *Milsen*, the franchisee did not file any antitrust claims nor were there "credible allegations of abuses of market power" as existed in *Milsen*. *Donuts, Inc*., 2000 WL 1808517 at *8 n. 2. Thus, the public policy justification for the denial of the injunction in *Milsen* was not present in *Donuts, Inc*. For those same reasons, *Milsen* is distinguishable from the present case. Furthermore, in *Milsen*, the Court determined that there was "little doubt" that plaintiffs had established at least a prima facie case of antitrust violations. But here, the allegations in Defendants' counterclaims and affirmative defenses are far from established, are "predicated on information and belief" (Def. Resp. Brief at 3), and, as discussed above, cannot be interpreted to avoid a breach of a franchise agreement in any event.

* * *

In sum, the factors that favor 7-Eleven—a high likelihood of success on the merits, the absence of an adequate remedy at law, the possibility of irreparable harm from the unlawful use of its marks and property, and arguably the balance of the irreparable harms and the public interest factor—weigh heavily in favor of granting an injunction. Applying the sliding scale "as would a chancellor in equity," the Court concludes that Plaintiff has made a sufficiently strong and clear showing of entitlement to immediate equitable relief in the circumstances of this case.

### III. Conclusion

For the reasons set forth above, Plaintiff 7-Eleven's motion for a preliminary injunction [8] is granted. The Court orders Defendants, their agents, servants and employees, and those persons in active concert or participation with them, to: (1) immediately surrender possession and control of the premises and facilities at 817 Davis Street in Evanston (the "Store"); (2) immediately surrender possession and control of the inventory and proceeds of the Store, which is subject to 7-Eleven's security interest; and (3) immediately surrender to 7-Eleven all signs, marketing materials, or other materials containing any of the 7-Eleven Marks. The Court also enjoins Defendants, their agents, servants and employees, and those people in active concert or participation with them, from: (1) using the 7-Eleven Marks or any trademark, service mark, logo or trade name that is confusingly similar to the 7-Eleven Marks; (2) otherwise infringing the 7-Eleven Marks or using any similar designation, alone or in combination with any other components; (3) passing off any of their products or services as those of 7-Eleven's or 7-Eleven's authorized franchisees; (4) causing a likelihood of confusion or misunderstanding as to the source or sponsorship of their businesses, products or services; and (5) Causing a likelihood of confusion or misunderstanding as to their affiliation, connection or association with 7-Eleven

and its franchisees or any of 7-Eleven's products or services. This matter remains set for status on July 13, 2011 at 9:00 a.m.

Dated: March 3, 2011

Robert M. Dow, Jr.
United States District Judge