**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| 7-ELEVEN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VIOLET SPEAR and VIANNA, INC., | ) | Case No. 10-cv-6697 |
| | ) | |
| Defendants/Counter-Plaintiffs, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| v. | ) | |
| | ) | |
| 7-ELEVEN, INC., | ) | |
| | ) | |
| Counter-Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff 7-Eleven, Inc. filed suit against Defendants Violet Spear and Vianna, Inc. (collectively "Defendants") seeking legal and equitable relief from Defendants concerning the termination of a franchise agreement between the parties. 7-Eleven terminated the agreement effective September 27, 2010, and demanded possession of the store, equipment, and inventory as provided in the franchise agreement and related agreements. Vianna and Spear, Vianna's owner and the guarantor of Vianna's obligations under the franchise agreement, continued to operate the store and hold the store out to the public as an authorized 7-Eleven store. The Court granted 7-Eleven's motion for preliminary injunction on March 3, 2011, ordering Defendants, among other things, to immediately surrender possession and control of the store to 7-Eleven and cease using 7-Eleven's trademarks. Defendants refused to comply with the preliminary injunction order and only surrendered possession of the store on March 9, 2011, after the Court held that they were in contempt of the preliminary injunction order.

Plaintiff has moved for summary judgment [102], filing the required notice to *pro se* litigants opposing a summary judgment motion [105]. Despite receiving an initial six-week period to file their response, as well as an additional one-month extension of time, Defendants have failed to respond to Plaintiffs' motion for summary judgment. For the reasons set forth below, the Court grants Plaintiffs' motion for summary judgment [102].

## I. Background

### A. Factual History[1]

7-Eleven is the owner of certain federally registered trademarks and service marks, including 7-Eleven® (the "7-Eleven Marks"), which are used in connection with the operation of authorized 7-Eleven Stores. 7-Eleven grants franchises to qualified persons to own and operate 7-Eleven Stores. Vianna is a former 7-Eleven franchisee that operated a 7-Eleven Store in Evanston, Illinois. Spear is the owner and sole-shareholder of Vianna.

Pursuant to written franchise agreements, 7-Eleven licenses franchisees to operate under the 7-Eleven Marks, and it leases the store premises to them, together with the fixtures, equipment, and signs needed to operate the store. 7-Eleven also provides financing to its franchisees, including financing for the store's inventory. Store inventory and other assets are

---

[1] Local Rule 56.1 requires that statements of fact contain allegations of material fact and that the factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. at 583-85 (N.D. Ill. 2000). In this matter, Plaintiff filed a Local Rule 56.1(a) Statement of Material Facts. In addition, Plaintiff served upon Defendant Spear the required Local Rule 56.2 Notice to Pro Se Litigants Opposing Summary Judgment [105]. In the instance case, Defendants did not file a Statement of Additional Undisputed Facts, a response to Plaintiff's Local Rule 56.1 Statement, or a memorandum in opposition to Plaintiff's motion for summary judgment. Because Defendants failed to file their own statement of facts, the Court takes the relevant facts from Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts. See *Brasic v. Heinemann's Bakeries, Inc., Inc.,* 121 F.3d 281, 284 (7th Cir. 1997); see also *Jupiter Aluminum Corp. v. Home Insurance Company,* 225 F.3d 868, 870-71 (7th Cir. 2000).

subject to a perfected security interest in 7-Eleven's favor, which secures all the indebtedness of the franchisees to 7-Eleven. In exchange for the license and lease, and for various other services (*e.g.*, advertising, merchandising assistance, bookkeeping, certain maintenance, payment of utility expenses, indemnification for specified losses), 7-Eleven is entitled under the franchise agreement to receive a specified percentage of the gross profits of the ongoing operation of the store. This percentage of gross profits is the primary benefit to 7-Eleven under the franchise agreement.

On March 14, 2008, 7-Eleven and Spear entered into a written franchise agreement (the "Franchise Agreement"), pursuant to which 7-Eleven granted Spear for an initial fifteen (15) year term, a franchise to operate a 7-Eleven store at 817 Davis Street in Evanston, Illinois (the "Store") and licensed Spear to use the 7-Eleven Marks in operating the franchise (the "Franchise Agreement"). Spear assigned the Franchise Agreement to Vianna, a corporation of which she was sole shareholder, but remained liable for all Vianna's obligations under the Franchise Agreement pursuant to a written guaranty (the "Guaranty"). Spear also entered into a security agreement with 7-Eleven (the "Security Agreement"), under which she granted 7-Eleven a security interest in the equipment, fixtures, goods, inventory and proceeds of the Store.

In addition to the obligations outlined above, Vianna agreed to operate its 7-Eleven Store in compliance with all laws, and in conformance with 7-Eleven's standards and specifications. Vianna agreed to maintain a minimum net worth of $15,000 in the Store at all times, and that failure to maintain the required net worth was a material breach of the Franchise Agreement. Vianna further agreed that, in the event 7-Eleven terminated the Franchise Agreement for cause, it would, among other things, (i) immediately surrender the Store premises and all 7-Eleven equipment, (ii) transfer final inventory of the Store, (iii) deliver to 7-Eleven its operations guides

and all trade secrets and confidential information, and (iv) comply with the franchise agreement's post-termination obligations. Vianna also agreed that, upon termination, it would immediately cease using the 7-Eleven Marks.

Although Vianna agreed in the Franchise Agreement to maintain a minimum net worth of $15,000 at all times, at the end of March, 2010, Vianna's net worth in the Store was about $6,500, a shortfall of nearly $8,500 in the required net worth. Because the parties agreed that failure to maintain the required net worth was a material breach of the Franchise Agreement, by letter dated April 28, 2010, 7-Eleven notified Vianna that it had three business days to increase the net worth to the required level, as well as to cure another monetary default under the Franchise Agreement. Vianna cured the material breaches which were the subject of the April 28, 2010 notice of material breach, but soon thereafter again failed to meet the minimum net worth requirement under the Franchise Agreement. Vianna's May 2010 financial statements indicated the Store's net worth was only $6,775.34 rather the required $15,000. Vianna's financial situation deteriorated from there. The shortfall from the minimum net worth requirement was $27,000 in June and more than $40,000 in July.

As a result of Vianna's failure to maintain the required minimum net worth, 7-Eleven sent a notice of material breach dated August 27, 2010 to Vianna advising Vianna that it had three business days to increase its net worth to the required level or 7-Eleven would terminate the Franchise Agreement. Defendants did not cure the minimum net worth material breach. Rather, the Store had a negative net worth of $43,962.09, nearly $59,000 under the minimum net worth required under the Franchise Agreement, at the end of August 2010. 7-Eleven did not terminate the Franchise Agreement immediately; instead, 7-Eleven extended the termination date in order to allow Vianna more time to cure the net worth deficiency and preserve its franchise rights.

However, as of the end of September 2010, Vianna was still nearly $40,000 under the required minimum net worth, and 7-Eleven terminated the Franchise Agreement effective September 27, 2010.

### B. Procedural History

After 7-Eleven terminated the Franchise Agreement, Defendants did not surrender possession of the Store, equipment and inventory, and continued to use the 7-Eleven Marks in connection with the operation of the Store. As a result, 7-Eleven filed its complaint in this action on October 18, 2010 and its motion for preliminary injunction on October 19, 2010. On March 3, 2011, the Court granted 7-Eleven's motion for preliminary injunction and ordered Defendants to, among other things, (i) immediately surrender possession and control of the premises and facilities at 817 Davis Street in Evanston, and (2) cease using 7-Eleven's trademarks and service marks. [50 at p. 15-16] Defendants did not immediately comply with the March 3 preliminary injunction order, and the Court found them in contempt for violating the order. Defendants turned over possession and control of the Store on March 9, 2011.

## II. Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

### III. Analysis

#### A. Contract Claims (Counts I, II, and III)

It is well-settled that "the elements for a breach of contract claim are (1) the existence of a valid and enforceable contract, (2) plaintiff's performance of the contract, (3) defendant's breach of the contract and (4) resulting injury to the plaintiff." *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Group, Inc.*, 218 F. Supp. 2d 974, 977 (N.D. Ill. 2002). Plaintiff maintains that Defendants have breached the Franchise Agreement, Guaranty, and Security Agreement.

By virtue of the fact that Defendants did not respond, Defendants do not dispute that the Franchise Agreement, Guaranty, and Security Agreement are valid and enforceable contracts, nor do Defendants dispute that 7-Eleven performed its obligations under the Franchise Agreement. Equally clear are Defendants' breaches of those agreements. Defendants' right to possess the inventory, equipment, and the premises of the Store was created by the Franchise

6

Agreement and the accompanying security agreements. The parties contemplated ejectment and surrender of all equipment and inventory to 7-Eleven following termination. Under the express terms of the Franchise Agreement, in the event that Defendants failed to maintain at least $15,000 in equity in the Store, and failed to replace any deficiency in capital within three business days of notice of material breach, 7-Eleven was entitled to terminate the Franchise Agreement, including Defendants' right of occupancy of the premises and to use 7-Eleven's Marks and brand. As set forth above and not disputed by Defendants, Defendants failed to meet the minimum net worth requirement during the months of March, May, June, July and August, 2010. During that period of time, 7-Eleven sent two formal notices of material breach with respect to the minimum net worth requirement. The first of those breaches was corrected, but the second was not. At the time the second notice of material breach was sent in late August 2010, Defendants had a shortfall in store equity of nearly $60,000. Although they made some capital contributions in September, they still were nearly $40,000 short of the minimum net worth that was required under the Franchise Agreement. Thus, 7-Eleven was entitled to terminate the Franchise Agreement for cause. See *All EMS, Inc. v. 7-Eleven, Inc.*, 2005 WL 2293675, at *4 (N.D. Ill. Jan. 4, 2005) (holding that when a franchisee's net worth falls below the required mark, that "fact alone is enough to prove" that the franchisee breached the agreement and have "surrendered their rights to the franchise"). 7-Eleven gave Defendants a month to correct the net worth default, but they never did.

Despite the termination of the Franchise Agreement, Defendants did not surrender full and complete possession of the Store, the equipment, and the inventory to 7-Eleven. Defendants did not surrender possession of their former franchised shop until March 9, 2011 – six days after the Court entered a preliminary injunction ordering them to immediately surrender possession.

Defendants' failure to comply with their post-termination covenants constitutes material breaches of the Franchise Agreement, Guaranty, and Security Agreement.

7-Eleven has demonstrated that it suffered substantial injury as a result of Defendants' material breaches of the agreements. On March 9, 2011, when Defendants surrendered possession of their store to 7-Eleven, Defendants' net worth deficit in the store was $115,921.17. That amount, which represents a debit balance on Defendants' Open Account (as that term is defined in the Franchise Agreement), is due and payable to 7-Eleven.

To the extent that 7-Eleven claims that it is entitled to a permanent injunction in this matter, it has not made the requisite showing. Although 7-Eleven claims that it has suffered at least two forms of irreparable harm as a result of Defendants' breaches of their post-termination obligations, it has not taken the necessary steps to establish all of the elements required to issue a permanent injunction. Permanent injunctive relief is available only when the plaintiff demonstrates (1) an irreparable injury; (2) remedies at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay, Inc. v. MercExchange, LLC,* 126 S.Ct. 1837, 1838 (2006).[2] "An injunction is an equitable remedy that does not issue as a matter of course, but

---

[2] Plaintiff argues that it has suffered two forms of irreparable harm as a result of Defendants' breaches of their post-termination obligations. First, for over five months after 7-Eleven terminated the Franchise Agreement, Defendants refused to surrender possession of their former franchised 7-Eleven Store to 7-Eleven. In support of this argument, Plaintiff cites cases from other jurisdictions. See, *e.g.*, *The Southland Corp. v. Froelich*, 41 F. Supp. 2d 227, 242 (E.D.N.Y. 1999) ("A real property owner's inability to make productive use of its own property may constitute irreparable harm."); accord *Persaud v. Exxon Corp.*, 867 F. Supp 128, 141 (E.D.N.Y. 1994); *Shell Oil Co. v. Altina Assocs., Inc.*, 866 F. Supp. 536, 541-42 (M.D. Fla. 1994) (ordering terminated service station operator to vacate leased premises). Defendants have not responded to Plaintiff's arguments or authority, and the Court concludes that 7-Eleven likely has suffered irreparable harm in this context; however, having failed to address the remaining elements of a permanent injunction in its summary judgment briefing, the Court cannot enter a permanent injunction on this basis alone. 7-Eleven also contends that it lost the customers and goodwill

rather a remedy that courts may grant at their discretion in the extraordinary situations where legal remedies such as monetary damages are inadequate." *Bedrossian v. Northwestern Memorial Hosp.*, 409 F.3d 840, 842 (7th Cir. 2005); see also *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311–12 (1982).

Damages are the norm in a contract case, so a plaintiff requesting injunctive relief has the burden of persuading the court that his case is different from the norm. *Walgreen Co. v. Sara Creek Property Co.,* 966 F.2d 273, 275 (7th Cir. 1992). When a permanent injunction is at issue, the plaintiff must show that damages will be a seriously deficient remedy for the harm suffered, not that denial of an injunction would work irreparable harm. *Id.* at 275. Neither side has addressed the factors relating to issuance of a permanent injunction; therefore, the Court will not enter one at this time.

## B. Lanham Act And Deceptive Trade Practices Claims (Counts IV, V, and VI)

In enacting the Lanham Act, it was Congress' avowed purpose "'[t]o protect trade-marks * * * to protect the public from deceit, to foster fair competition, and to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.'" *Truck Equip. Serv. Co. v. Freuhauf Corp.*, 536 F.2d 1210, 1215 (8th Cir.) (quoting S. Rep. No. 1333, 1946 U.S. Code Cong. Serv. 1274, 1276), *cert. denied*, 429 U.S. 861 (1976). The Lanham Act effects this purpose through two principal provisions: (i) Section 32(1), which proscribes trademark infringement by prohibiting the use of a reproduction of a registered mark; and (ii) Section 43(a), which prohibits, among other things, false designations as to the source or origin of business establishments, services, and goods. To

---

associated with the Store when Defendants deprived 7-Eleven of its contractual right to possession of the Store from September 2010 through March 2011. Beyond asserting that it has lost customers and the goodwill associated with the Evanston store, 7-Eleven has not put forth evidence of consumer dissatisfaction or a loss of goodwill. Therefore, the Court declines to make the finding urged by Plaintiff.

9

prove a violation of either section, as well as a violation of the Illinois Deceptive Trade Practices Act, 7-Eleven must establish that (1) the marks are registered; (2) the marks were used in commerce by Defendants without 7-Eleven's authorization, and (3) the unauthorized use was likely to cause confusion, or mistake, or to deceive the public.[3] See *Dunkin' Donuts Inc. v. Donuts, Inc.*, 2000 WL 1808517, at *4 (N.D. Ill. Dec. 6, 2000).

Here, Defendants' continued, unauthorized use of the 7-Eleven Marks constituted trademark infringement in violation of §§ 32(1) and 43(a) of the Lanham Act, as well as a violation of the Illinois Deceptive Trade Practices Act. See *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989) ("'Once a franchise has been terminated, the franchisee cannot be allowed to keep on using the trademark."); *Donuts, Inc.*, 2000 WL 1808517, at *4 ("Where a franchisee materially defaults under a franchise agreement and that agreement is validly terminated – yet the franchisee continues to use the marks and trade name without the franchisor's consent – such continued use is unlawful under the Lanham Act.") (citations omitted). The 7-Eleven Marks include the 7-Eleven service mark, logo and design which was registered with the United States Patent and Trademark Office on the Principal Register on August 11, 1970, Federal Registration No. 896,654, and the 7-Eleven service mark, which was registered with the United States Patent and Trademark Office on the Principal Register on September 21, 1971, Federal Registration No. 920,897. (Padgett Decl. at ¶ 6; SUF ¶

---

[3] "As a general rule * * * the same facts which would support an action for trademark infringement [under Section 32(1)] would also support an action for unfair competition [under Section 43(a)]." *Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir.), *cert. denied*, 423 U.S. 868 (1975); accord *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 n.16 (7th Cir. 1976); *Bunn-O-Matic Corp. v. Bunn Coffee Service, Inc..,* 88 F. Supp. 2d 914, 924 (C.D. Ill. 2000) ("Proof of trademark infringement constitutes unfair competition under both Illinois and New York law"); *Pirelli Armstrong Tire Corp. v. Titan Tire Corp.*, 4 F. Supp. 2d 794, 799 (C.D. Ill. 1998) (same). Similarly, the same set of facts will support a claim for both trademark infringement and unfair competition under the Illinois Deceptive Trade Practices Act. See *McDonald's Corp. v. Gunvill*, 441 F. Supp. 71, 74-75 (N.D. Ill. 1977).

3.) There is no dispute that Defendants used the 7-Eleven Marks in commerce without authorization from September 27, 2010 through and including March 9, 2011, when Defendants finally surrendered possession of their former franchised 7-Eleven Store to 7-Eleven.[4]

Equally clear is that Defendants' unauthorized use of the 7-Eleven marks after termination of the Franchise Agreement likely caused confusion, or mistake, or deceived the public. See *Dunkin' Donuts Franchised Restaurants v. Elkhatib*, 2009 WL 2192753, *5 (N.D. Ill. July 17, 2009) ("where a holdover franchisee * * * utilizes the franchisor's marks, the 'likelihood of confusion is inevitable'"); *Bunn-O-Matic Corp.*, 88 F. Supp. 2d at 922 ("The likelihood of confusion exists as a matter of law if a licensee continues to use marks owned by the licensor after termination of the license."); see also *Abercrombie & Fitch v. Fashion Shops of Kentucky, Inc.,* 363 F. Supp. 2d 952, 966 (S.D. Ohio 2005). "A licensee who once had authorization becomes associated in the public mind with the licensor or franchisor." *Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1504 n. 4 (S.D. Fla. 1995) (quoting 3 J. McCarthy, *Trademarks and Unfair Competition* § 25.07[1], at 25-48.2 (3d ed. 1994)). Therefore, when a franchisee "loses authorization but continues use of the [franchisor's] mark, 'the potential for consumer confusion is greater than in the case of the random infringer,'" (*id.* (quoting 3 J. McCarthy, *Trademarks and Unfair Competition* § 25.07[1], at 25-48.2 (quoting *Church of Scientology Int'l v. Elmira Mission of The Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986))), because the public is fraudulently "led to think that the ex-licensee is still connected

---
[4] Both Defendants admitted in their answer that they continued to use the 7-Eleven Marks after the termination of the Franchise Agreement in connection with the operation of the former franchised Store. [See 30 at ¶¶ 35-36.]

with the licensor." 3 J. McCarthy, *Trademarks and Unfair Competition* § 25.07[1].[5] For this reason, it is "well-settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement." *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992); see also *Gorenstein Enters., Inc.*, 874 F.2d at 435. In fact, as a leading commentator has noted, such cases are "open and shut." 3 J. McCarthy, *Trademarks and Unfair Competition* § 23.3; see also *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 649 (6th Cir.), *cert. denied*, 459 U.S. 916 (1982); *Two Men and a Truck/Int'l v. Two Men and a Truck/Kalamazoo, Inc.*, 1995 WL 549278, at *5 (W.D. Mich. July 24, 1995).

From the date 7-Eleven terminated the Franchise Agreement effective September 27, 2010 through the date that Defendants ceased using the 7-Eleven Marks and surrendered possession of the Store on March 9, 2011, 7-Eleven contends that Vianna made and reported to 7-Eleven sales of $391,300.56 in products and services under 7-Eleven's trademarks and service marks. 7-Eleven maintains that it is entitled to recover those sales pursuant to 15 U.S.C. § 1117. See also *Sparks Tune-Up Centers, Inc. v. Panchevre*, 1992 WL 368057, at *4 (N.D. Ill. Dec. 3, 1992) (awarding to plaintiff the defendants' gross sales during the period of defendants' trademark infringement). Moreover, Plaintiff argues that Defendant's infringement was deliberate and willful and consequently ask the Court to find that 7-Eleven is entitled to recover an amount not to exceed three times the amount of those sales, or $1,173,901.68. See 15 U.S.C. § 1117(a). See also *Gorenstein Enters., Inc.,* 874 F.2d at 436 (holding that the provision

---

[5] Accord *Ramada Franchise Sys., Inc. v. Royal Vale Hospitality of Cincinnati*, 2005 WL 435263, at *15 (N.D. Ill. Feb. 16, 2005); *Dunkin' Donuts, Inc. v. Towns Family, Inc*., 1996 WL 328018, at *4-5 (N.D. Ill. June 11, 1996).

allowing for an award of three times the amount of damages is "properly invoked when * * * the infringement is deliberate.").

In not responding to Plaintiff's motion for summary judgment, Defendants have, in a sense, acquiesced to the $391,300.56 figure provided by Plaintiff. Indeed, the burden is on a defendant to prove elements of any costs or deductions that it would like to claim. 15 U.S.C. § 1117(a). However, as of yet, Plaintiff has not submitted to the Court any evidence (beyond one paragraph of an affidavit) of Defendants' profits. The Seventh Circuit has held that "a plaintiff wishing to recover damages for a violation of the Lanham Act must prove the defendant's Lanham Act violation, that the violation caused actual confusion among consumers of plaintiff's product, and, as a result, that plaintiff suffered actual injury, i.e. a loss of sales, profits, or present value (good will)." *Web Printing Controls Co. v. Oxy-Dry Corp.,* 906 F.2d 1202, 1204-05 (7th Cir. 1990). Although Plaintiff has established Defendants' violation of the law, it still must provide the Court with evidence of actual losses of sales, profits, or goodwill. In other words, should Plaintiff wish to pursue these damages on top of the figure already awarded on the contract claims, Plaintiff must provide the Court with *detailed* affidavits or other evidence of damages sustained in the way of loss of revenue, loss of goodwill, and damages to its goodwill and reputation as a result of Defendants' acts. See also *Quidgeon v. Olsen*, 2011 WL 98938, at *4 (C.D. Ill. Jan. 11, 2011). The substantial amount set forth in Plaintiff's statement of facts must have support beyond one sentence in an affidavit.

As previously noted, Plaintiff also seeks to have any such damages or profits trebled pursuant to 15 U.S.C. § 1117. According to § 1117(a), the Court may enter judgment for a sum higher than the amount of actual damages, not to exceed three times the amount, depending on the circumstances of the case. This provision is properly invoked when the infringement is

deliberate or willful. *Gorenstein Enterp., Inc. v. Quality Care-USA, Inc.,* 874 F.2d 431, 435-36 (7th Cir. 1989). However, this section only authorizes the trebling of damages, not of profits. See *Thompson v. Haynes,* 305 F.3d 1369, 1380 (Fed. Cir. 2002). Here, Defendants certainly knew of the infringing nature of their conduct at the time that the Court issued its preliminary injunction order. Therefore, it appears that an award of treble damages may be appropriate in this case for the time between March 3 through March 9, 2011. However, the Court defers this determination until Plaintiff, if it chooses to do so, provides actual evidence of damages in conjunction with its lost-profits arguments, so that the Court may first ascertain the extent of damages caused.

### C. Attorneys' Fees

The Lanham Act allows for attorneys' fees in "exceptional" cases, 15 U.S.C. § 1117(a), which encompasses cases in which the acts of infringement are "malicious, fraudulent, deliberate or willful." *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 942 (7th Cir. 1989), *cert. denied,* 493 U.S. 1075. The Seventh Circuit has held that "exceptional cases" include those involving willful violations by the defendant and egregious conduct by a party in litigation. *TE-TA-MA Truth Foundation-Family of URI, Inc. v. World Church of the Creator,* 392 F.3d 248 (7th Cir. 2004); *Badger Meter, Inc. v. Grinnell Corp.,* 13 F.3d 1145 (7th Cir. 1994); *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.,* 874 F.2d 431, 435 (7th Cir. 1989) (upholding award of attorney's fees where defendant continued to use plaintiff's trademarks after termination of the franchise and licensing agreement). Plaintiff represents that it incurred $233,706.91 in attorneys' fees and costs in this matter from October 2010 through and including December 2011. See also 15 U.S.C. § 1117(a), *Gorenstein Enters., Inc.,* 874 F.2d at 436; *Sparks Tune-Up Centers, Inc*, 1992 WL 368057, at *4. "A decision to award attorneys' fees under the Lanham Act is firmly

committed to the district court's discretion." *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1099 (7th Cir. 1994) (citing *Otis Clapp & Sons, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 747 (7th Cir. 1985)); *Roulo v. Russ Berrie,* 886 F.2d at 942.

In its summary judgment motion, Plaintiff has not put forth evidence or argued that Defendants' infringement was "malicious," but it has demonstrated that the infringement, at least after the Court's issuance of the preliminary injunction order on March 3, through the contempt hearing on March 9, 2011, was "willful." See, *e.g.*, *Badger Meter,* 13 F.3d at 1158-60. Furthermore, by failing to respond to the motion for summary judgment, Defendants have waived any right to contradict the assertion of willfulness from, at a minimum, March 3 through March 9, 2011. Thus, the Court concludes that Plaintiff is entitled to attorneys' fees for the time spent preparing for and arguing Plaintiff's motion for rule to show cause and the corresponding contempt proceedings. The Court denies Plaintiff's request for the remainder of its fees. The time and resources expended after March 9 through December 2011 were largely spent trying to settle the remaining disputes between the parties. The Court, in its discretion, does not believe an award of fees is warranted for these efforts.

**IV. Conclusion**

For these reasons, the Court grants Plaintiff's motion for summary judgment [102]. At this time, the Court has concluded that damages in the amount of $115,921.17 are due and payable to 7-Eleven. Plaintiff also is entitled to its attorneys' fees for the time spent preparing for and arguing Plaintiff's motion for rule to show cause and the corresponding contempt proceedings. The Court will defer entering judgment to give Plaintiff time to advise the Court whether it wishes to pursue additional damages on the Lanham Act claim and to provide the Court with an adjusted fee petition covering the attorneys' fees noted previously. In the event

that Plaintiff does not wish to pursue additional damages, the Court will enter judgment in favor of Plaintiff and against Defendants in the amount of $115,921.17. Consistent with the discussion above, Plaintiff is given 21 days to (1) file a status report advising the Court how it wishes to proceed in regard to the Lanham Act claim and (2) file a revised fee petition. The Court will award Plaintiff attorneys' fees in an amount certain after it receives Plaintiff's revised fee petition.

Dated: May 11, 2012                    _____
                                                  Robert M. Dow, Jr.
                                                  United States District Judge